# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* CECILE PORTILLA and THE STATE OF NEW JERSEY *ex rel.* CECILE PORTILLA, | Civ. No. 12-1842 (KSH) (PS) |
| Plaintiffs, | **FIRST AMENDED COMPLAINT** |
| - against - | Attorney of Record: |
| RIVERVIEW POST ACUTE CARE CENTER, GREAT FALLS OPERATIONS LLC and OMNI ASSET MANAGEMENT LLC, | Jack M. Kint, Jr. 187 Southern Boulevard Chatham, New Jersey 07928 Telephone: (973) 457-5456 Facsimile: (888) 848-0764 jmk@kintlaw.com |
| Defendants. | |

Plaintiff the United States of America *ex rel.* Cecile Portilla and the State of New Jersey *ex rel.* Cecile Portilla, by and through her attorneys, Sadowski Fischer PLLC and the Law Office of Jack Kint, allege for their complaint as follows:

## PRELIMINARY STATEMENT AND NATURE OF THE ACTION

This is a civil action brought by relator Cecile Portilla on her own behalf and on behalf of the United States of America ("United States") against Riverview Post Acute Care Center ("Riverview"), Great Falls Operations LLC, and Omni Asset Management LLC, under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* and the New Jersey False Claims Act, *N.J.S.A.* §§ 2A:32C-1 *et seq.*, to recover damages sustained by, and penalties owed to, the United States and to New Jersey as the result of Defendants having knowingly presented or caused to be presented to the United States and to New Jersey false claims for the payment of funds disbursed under the

Medicare Program, 42 U.S.C. §§ 1395c-1395i-4, and the Medicaid Program, 42 U.S.C. §§ 1396 *et seq.*, in excess of the amounts to which Defendants were lawfully entitled from 2002 through the present.

1.      These claims are based on the Defendants' submission of false and fraudulent patient claims to the United States and New Jersey in order to obtain millions of dollars in payments for various healthcare services from 2002 through the present.

2.      These claims are based upon the submissions of Defendants' false and fraudulent claims for payment as follows:

- Defendants routinely billed Medicare and Medicaid for services never provided to Riverview's residents, as well as for services inadequately provided or that otherwise were harmful, worthless, and unnecessary.

- Riverview is an unsafe environment that provides substandard care to its residents, who are often consequently degraded and harmed, and such acts have even resulted in premature deaths.

- In particular, Riverview bills for, but fails to provide, bed and chair alarms for residents who cannot ambulate independently.  This failure to provide alarms has resulted in injuries and in premature death.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the claims brought under the False Claims Act pursuant to 31 U.S.C. § 3730(a), 28 U.S.C. §§ 1331, 1345, and 1367.

4.      Venue lies in this District pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. §§ 1391(b) and 1391(c), because Defendants are located in this District, do business in this District, and because many of the acts complained of herein took place in this District.

## PARTIES

5.        Plaintiffs are the United States of America on behalf of its agency the United States Department of Health and Human Services ("HHS") and New Jersey on behalf of its agency the Department of Health and Senior Services ("DOH").

6.        Relator Cecile Portilla is an individual, residing at 3 Ardmore Road, West Orange, New Jersey 07052.  She is a former employee of Riverview, where she was employed as a registered nurse and night supervisor from June 2011 until March 2, 2012.  She has direct and independent knowledge of the allegations herein which she learned during and because of her employment at Riverview.  She disclosed her allegations to the Government prior to commencing this action, and her disclosure led to an investigation by the New Jersey Department of Health.

7.        Riverview is a for-profit post-acute care nursing home located at 77 East 43rd Street in Paterson, New Jersey.  Riverview has 180 certified beds with an 81% occupancy rate.  It currently has 161 residents.  Avery Eisenreich and Toby Eisenreich are listed as officers of Riverview, and Roy David is listed as its Administrator.  Upon information and belief, Toby Eisenreich is also known as Rivka Jacobowitz.  Riverview is owned by Great Falls Operations LLC, 26 Journal Square, 16th Floor, Jersey City, New Jersey 07306.  Avery Eisenreich is listed as an officer of at least 13 nursing homes in New Jersey.  Avery Eisenreich is also the owner of Omni Asset Management LLC, at 26 Journal Square, 16th Floor, Jersey City, New Jersey 07306.  Omni, a private company, is listed as the owner of 13-16 nursing homes in New Jersey and also as a wholesale physicians' and surgeons' equipment supplier.

### THE APPLICABLE LAW

**A.     The Medicare Program**

8.     The United States, through HHS, administers the Medicare program for the aged and disabled ("Medicare"), established by Title XVIII of the Social Security Act. *See* 42 U.S.C. §§ 1395 *et seq.*  Part A of Medicare provides federal payment for patient institutional care, including hospitals, and skilled nursing facilities, *i.e.*, nursing homes. *See* 42 U.S.C. §§ 1395c-1395i-4.  Part B of Medicare provides supplemental insurance coverage for medical and other services that are not covered by Part A.  42 U.S.C. §§ 1395j-1395w-4.

9.     The Centers for Medicare and Medicaid Services ("CMS") is the governmental body that is responsible for administering Medicare.

10.     Under Medicare, CMS makes payments to medical providers, such as nursing homes, for inpatient and outpatient services after the services are rendered.  Medicare enters into provider agreements with hospitals, nursing homes, and other medical providers, that govern their participation in the program.  Under Medicare, reimbursement is prohibited if the item or service is not "reasonable and necessary for the diagnosis and treatment of illness or injury …."  42 U.S.C. § 1395y (a)(1)(A).

11.     Under Medicare, services provided to patients are reimbursed according to two different methods.  For Part A services rendered to inpatients, as a general matter, Medicare reimburses based on a diagnostic related group (DRG) under the Prospective Payment System (PPS).  For Part B services rendered to outpatients, prior to October 1, 2000, Medicare reimbursed based on cost.  Subsequent to that time, Medicare has reimbursed most outpatient services based on an outpatient PPS.  Medicare also reimburses under Part B under a fee schedule for certain services and equipment.

12.     A skilled nursing facility ("SNF"), such as a nursing home, is paid a daily rate for Part A services for each resident, determined by that resident's care and resource needs,

4

which is categorized into a payment grouping known as a Resource Utilization Group. ("RUG").
In order to determine a resident's RUG, the SNF is required to use an assessment tool known as
the Minimum Data Set ("MDS").  The MDS is conducted at multiple times during a resident's
stay.  A resident's daily rate depends on a provider's answers to the questions on the MDS.  In
order to be reimbursed by Medicare and Medicare, a provider must submit a MDS, along with a
certification stating that MDS is accurate, and that such accuracy is a condition of payment.

13.     At all times relevant hereto, Riverview was required to — and did —
submit MDS reports for its patients, along with the necessary certifications.

14.     To assist in the administration of Medicare Part A, CMS contracts with
private non-governmental organizations or "fiscal intermediaries" to, *inter alia*, review and
process claims for reimbursement submitted by healthcare providers, including the claims
submitted by defendant.  42 U.S.C. § 1395h.  Fiscal intermediaries, typically insurance
companies, are responsible for processing and paying claims and auditing cost reports.

15.     As a prerequisite to payment by Medicare, CMS requires each healthcare
provider to submit a Medicare cost report annually at the conclusion of the provider's fiscal year.
The cost report is the final claim that a hospital or nursing home files with the fiscal intermediary
identifying its costs for services rendered to Medicare beneficiaries and stating the amount of
reimbursement to which the hospital or nursing home believes it is entitled for the year.  *See* 42
U.S.C. § 1395g(a); 42 C.F.R. § 413.20; *see also* 42 C.F.R. § 405.1081(b)(1).

16.     Medicare relies upon the cost report to determine whether the healthcare
provider is entitled to more reimbursement than the interim payments that the provider has
received from Medicare during the course of the year, or whether the provider was overpaid by

Medicare, and, consequently, must reimburse Medicare for the excess amounts paid under the program during the course of the year.   *See* 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

17.     At all times relevant hereto, Riverview was required to submit cost reports to its fiscal intermediaries.

18.     Every Medicare cost report contains a "Certification" that must be signed by the chief administrator of the institution or a responsible designee of the administrator. The Medicare cost report certification page includes the following notice:

> Misrepresentation or falsification of any information contained in this Cost Report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law.   Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

19.     The responsible healthcare provider official is required to certify, in pertinent part, that:

> to the best of my knowledge and belief, [the cost report and the balance sheet and the statement of revenue and expenses] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of healthcare services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

20.     Thus, the healthcare provider must certify that its Medicare cost report is (1) truthful, *i.e.*, that the cost information contained in the report is true and accurate; (2) correct, *i.e.*, that the hospital is entitled to reimbursement for the reported costs; (3) complete, *i.e.*, that the cost report is based upon all cost information known to the provider; and (4) that the services identified in the cost report are billed in compliance with the law.

21.     Furthermore, the healthcare provider has the legal obligation to disclose to Medicare through its fiscal intermediary all known errors and omissions in its claims for Medicare reimbursement, including those costs identified in its cost reports:

> Whoever . . . having knowledge of the occurrence of any event affecting (A) [a nursing home's] initial or continued right to any such benefit or payment . . . conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized . . . shall in the case of such a . . . concealment or failure . . . be guilty of a felony. . .

42 U.S.C. § 1320a7b(a)(3).

22.     At all times relevant hereto, Riverview was required to — and did — submit its annual Medicare cost reports to the Government through the fiscal intermediary, as well as certify its Medicare cost reports.

23.     Additionally, in order to be reimbursed by Medicare, a healthcare provider must enroll in the Medicare program and submit an enrollment application to CMS.  Every such enrollment application contains a "Certification Statement" that must be signed by an appointed official of the provider, such as its chief executive officer. The appointed official is required to certify, in pertinent part, that:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider.  The Medicare laws, regulations, and program instructions are available through the Medicare contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.  CMS Form 855A.

24.     At all times relevant hereto, Riverview was required to submit, and did submit, a Medicare enrollment application to CMS, which application contained a Certification Statement signed by the appropriate Riverview official.

## B.     The Medicaid Program

25.     The Medicaid program was created by Title XIX of the Social Security Act to provide healthcare benefits for poor and disabled individuals ("Medicaid").  42 U.S.C. §§ 1396-1396v.  Medicaid is funded by both state and federal funds, with the federal contribution computed separately for each state.  42 U.S.C. §§ 1396b, 1396d(b).  Medicaid is administered at

the federal level by CMS.  Federal involvement in Medicaid is largely limited to providing

matching funds and ensuring that the states comply with minimum standards in the

administration of the program.

26.     The federal Medicaid statute sets forth the minimum requirements for state

Medicaid Programs to qualify for federal funding, which is called federal financial participation

("FFP").  42 U.S.C. §§ 1396 *et seq.*

27.     New Jersey administers Medicaid through DOH.

28.     Medicaid Reimbursement is prohibited if the item or service is not

medically required, if it is not properly documented in medical records, and if the quality of care

is not acceptable.  N.J.A.C. 10:49 5.5(a)(13).

29.     In order to be reimbursed by Medicaid, a nursing home such as Riverview

must enroll in the New Jersey State Medicaid Program.

30.     At all times relevant hereto, Riverview was required to submit, and did

submit, an application to be an approved nursing home and an enrollment application to

participate in the New Jersey State Medicaid Program, as well as enter into a provider agreement

with New Jersey.

31.     At all times relevant hereto, Riverview was required to submit, and did

submit, along with such applications a certification that it would comply with all DOH and

Medicaid regulations, as well as impliedly certify compliance with such regulations by

submitting claims for reimbursement.

32.     Defendants sought reimbursement from Medicaid for the time period

pertinent to this Amended Complaint.

**C.**     **The Nursing Home Reform Act and New Jersey State DOH Regulations**

33.     Pursuant to the Nursing Home Reform Act ("NHRA") and certain Department of Health Regulations, Defendants were required to meet certain Federal and State quality standards in order to qualify to receive Medicare and Medicaid funds, and expressly and or impliedly certified compliance with the NHRA and the DOH regulations upon enrollment in and upon submitting bills to Medicare and Medicaid, and in their cost reports.

34.     The NHRA establishes quality-of-life and quality-of-care requirements that facilities must meet in order to participate in and be reimbursed by Medicare and Medicaid. Under the NHRA, a "skilled nursing facility must provide services to attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident," including but not limited to nursing services, specialized rehabilitative services, pharmaceutical services and dietary services.  42 C.F.R. 483.25; 42 U.S.C. § 1396r.

35.     Under the NHRA, Medicare and Medicaid regulations, and DOH regulation, residents must be properly assessed and examined, and the correctness of the assessment must be certified.  Additionally, their care must be properly supervised by a physician.   The nursing staff must be competent and properly trained.  The residents must be treated with dignity and provided an environment free from abuse, including but not limited to, physical abuse, inappropriate isolation, or the inappropriate use of medications.  Additionally, nursing homes are barred from retaliating against their employees or residents for raising complaints about quality of care or abuse.

**D.     The Federal False Claims Act**

36.     The False Claims Act provides, in pertinent part, that:

any person who (A) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used,

a false record or statement material to a false or fraudulent claim; (C) conspires to commit a violation of subparagraph (A), (B) . . . or (G); . . . or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than [$5,500] and not more than [$11,000]… plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729.

37.     Billing the Government for the provision of unreasonable, unnecessary, harmful, or worthless services constitutes false claims under the False Claims Act.

38.     The False Claims Act is violated by falsely and expressly and/or impliedly certifying compliance with statutes or regulations, such as the NHRA, and then seeking reimbursement from and Medicare, Medicaid, and other government programs for such false claims.

**E.     The New Jersey False Claims Act**

39.     The New Jersey False Claims Act provides, in pertinent part, that:

(1) Any person who (a) knowingly presents or causes to be presented to any employee, officer or agent of the State, . . . a false or fraudulent claim for payment or approval; (b) knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State . . . (g) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State

*        *        *

shall be liable to the State for a civil penalty of not less than and not more than the civil penalty allowed under the federal False Claims Act, plus three times the amount of damages which the State sustains.

New Jersey False Claims Act, *N.J.S.A.* §§ 2A:32C-3.

40.     Billing the State of New Jersey for the provision of unreasonable, unnecessary, harmful, or worthless services constitutes false claims under the New Jersey False Claims Act.

41.     The New Jersey False Claims Act is violated by falsely and expressly and/or impliedly certifying compliance with statutes or regulations, such as DOH regulations, and then seeking reimbursement from Medicaid for such false claims.

## THE FACTS

**A.     Life-Safety Failures, Resident Neglect, and Fraudulent Billing**

42.     Bed alarms are devices used by nursing homes and hospitals to alert the staff when a patient attempts to get out of bed unaided.  Should the patient attempt to do so, the bed alarm is triggered and sounds loudly to alert staff members, who then re-direct the patient or provide assistance to the patient.

43.     Upon admission to Riverview, resident X suffered episodes of confusion, was consequently designated a fall risk, and thus was not allowed to ambulate by himself.  Upon admission, resident X's physician ordered a chair and bed alarm installed to alert Riverview staff of resident X's attempts to ambulate.  At approximately 5:00 a.m. on January 5, 2012, resident X fell while trying to go to the bathroom unaided.  No bed or chair alarm sounded prior to resident X's fall.  Hours later, resident X died.   Riverview billed Medicaid for an alarm as well as for resident X's daily rate during his stay, despite its failure to provide appropriate services. Riverview submitted an MDS to the Government that described resident X's medical condition and needs, including his requirement for a bed alarm, which resulted in a higher RUG rate.

44.     While Relator was drafting the incident report concerning resident X, Riverview staff told Relator that she should document that "the bed alarm or chair alarm sounded

and upon responding to the alarm the resident was already found on the floor."  Relator refused to provide such documentation.

45.     The next day, Relator evaluated the bed-alarm system on all floors of Riverview.  Relator found that of the 28 residents who had orders for bed alarms, only one resident had a functional bed alarm.  Relator found alarms that were broken or were missing batteries, connection cords, sensor pads, or other parts.  The majority of residents who had orders for bed alarms had no alarm devices present.

46.     At each shift change every day, certified nursing assistants ("CNAs") and nurses are required to sign the Treatment Administration Record ("TAR") and Activities of Daily Living ("ADL"), respectively, to record that the bed and chair alarm systems are present, tested, and functional.  Relator's review of the TAR and ADL on each floor of Riverview revealed that nurses and CNAs were signing and routinely verifying that at every shift those alarms were present and functional despite the fact that they were not present and were not functional.   These records were used to cover up Riverview's fraud and to induce the Government to pay Medicare and Medicaid claims for reimbursement as well as to avoid paying money back to the Government

47.     On or about January 6, 2012, Relator informed Riverview's Director of Nursing and its Assistant Director of Nursing of her findings and requested that bed alarms be purchased and installed.  In follow-up conversations, Quality Assurance Managers, Charge Nurses, and the Assistant Director of Nursing at Riverview reported to Relator that they were working on getting the bed alarms in place.

48.     During the evening shift on February 23, 2012, a Riverview resident fell from his bed.  No bed alarm sounded prior to the fall.  The resident was transferred to a hospital

emergency room for evaluation.  While at the emergency room, the resident suffered a stroke and was admitted to the hospital.

49.     At 2:00 a.m. on February 24, 2012, Relator again evaluated all the bed alarms in Riverview.  Of the 26 bed alarms ordered for residents who were at risk for falls, only one alarm was functional.  Most of the required alarms were missing.  From the beginning of February 2012, nurses and CNAs on each shift had nonetheless signed the TARs and ADLs verifying that the alarms were in place and functional.

50.     Relator found ineffective, broken, or missing bed alarms for residents in rooms 202W, 203W, 205W, 231D, 425D, 425W, 434D, 434W, 436D, 402D, 404D, 406W, 420W, 422D, 423D, 3111P, 322D, 333D 338D, 338W, 339D, 340W, 341W, 343W, and 344P. Riverview unlawfully billed Medicare and Medicaid for those bed alarms and also the full daily rates for those residents.

51.     At 9:00 a.m. on February 24, 2012, Relator reported her findings of the deficient bed and chair alarms to the New Jersey Department of Health and Senior Services via internet.

52.     On February 27, 2012, Relator communicated her findings to the New Jersey Department of Health and Senior Services in writing.

53.     In early March 2012, a confused resident from room 307P, who was prescribed a Wanderguard™ alarm, eloped from Riverview and was missing for hours until the Paterson Police Department returned the resident to Riverview.  Whenever a resident wearing a functional Wanderguard™ approaches an exit, there is a loud continuous overhead alarm.  Once a Wanderguard™ sounds, a staff member must turn it off manually.  In the case of the resident

from room 307P, it is unclear whether the Wanderguard™ was nonfunctional and/or that staff failed to notice that the resident was missing.

54.     There is no security guard at Riverview after 4:00 a.m.  Riverview is located in a high-crime area.  Because the lock at Riverview's parking-lot entrance does not function, anyone attempting to gain access to the facility after 4:00 am could do so by simply pushing open the door.

55.     When a person becomes a resident of a nursing care facility, the facility administration is advised if the resident is at risk for falls.  For each such resident, the facility must purchase bed and chair alarms.  Those alarms are purchased individually and are not kept in the stock room accessible to supervisors.  Riverview's managers, directors, and administrators know, but have failed to address, the deficiencies in its bed and chair alarms.  Riverview's management also is aware of the high incidence of falls at Riverview.  Residents and CMS are charged for safety devices, including bed and chair alarms.  CMS encourages their use.  Riverview is fraudulently verifying that those alarms are installed and functional, which compromises the safety of the residents who require them.  Riverview's procedures for making such verifications are paid services.  Thus, Riverview has billed residents and CMS for alarms that it has not purchased and for services that it has not performed.   By billing Medicare and Medicaid for non-functioning alarms, and by making MDS submissions to the Government representing that the residents' daily rates should be increased to cover their needs, Riverview submitted false claims.

56.     To the extent Defendants provided any services, such services were unreasonable, unnecessary, worthless and harmful and therefore also constitute false claims.  Additionally, these acts by Defendants also violated the NHRA and New Jersey DOH

14

regulations.  Defendants thus falsely and expressly and/or impliedly certified compliance with

the NHRA and New Jersey DOH regulations, and sought reimbursement from Medicare,

Medicaid, and other government programs for such false claims.

**B.    The Communications Books**

57.    On March 5, 2012, Relator again wrote to the New Jersey Department of

Health and Senior Services.  Relator alerted the Department that Riverview's Nursing

Supervisors and its Nursing Office maintained logs called Communication Books.

58.    Riverview maintained the Communication Books from at least June 2011

to the third week of February 2012 in the form of either spiral wide-ruled notebooks or

composition books with faux marble covers.

59.    Each supervisor made entries in the Communication Book regarding

events or concerns that arose during his or her shift and then passed it to the next shift.  At the

end of the night shift, the book was placed in the Director of Nursing's in-box.  During the day,

the Director of Nursing and the Assistant Director of Nursing maintained the book, and at the

end of the day shift would pass the book to the evening-shift supervisor who in turn would pass

the book to the night-shift supervisor.

60.    In the Communication Book, Relator documented each resident's name,

room number, and either what was wrong with that resident's alarm or the absence of an alarm.

61.    Relator advised her staff not to sign for bed or chair alarms that were not

installed and functional.  Relator wrote up many staff members for numerous violations of that

instruction.  Riverview's management, however, advised Relator not to write up any more

violations for fear that staff might retaliate by not showing up for work.

62.    In late February 2012, Relator noticed that the Communication Books

were missing.  The Communication Books for the period from August 2011 through February

15

2012 will reveal Relator's concerns regarding patient safety and show that Riverview's management was aware of numerous problems in that regard.   Riverview's removal of the Communication Books was another example of its practice of altering records to cover up fraud, and amounted to another violation of the False Claims Act.

C.    **Unsafe and Substandard Practices Lead to Harm and Abuse of Patients**

63.    All Riverview patients with feeding tubes have orders for abdominal binders to cover the feeding tube.  Physicians order binders to be placed over the tubes to secure them.  Frequently, residents either pull out the tubes or the tubes become accidentally dislodged. Despite the absence of binders, nurses at Riverview sign the TAR every shift verifying that binders are in place.  Binders must be replaced frequently because they become unsanitary and cannot be cleaned because they are made of elastic.   Relator brought the problem of missing binders to the attention of Riverview's management and recorded her findings concerning the binders in the Communications Book.

64.    There is a pattern of residents at Riverview suffering from dehydration. Dehydration can lead to renal insufficiency and even death.  Providing water to residents through feeding tubes is a very slow process.  Nurses who are overworked skip giving water to residents who do not drink by themselves.  Since June 2011, at least three Riverview residents have been hospitalized at either St. Mary's hospital in Passaic or St. Joseph's Hospital in Paterson and diagnosed with "dehydration" or "severe dehydration."

65.    Riverview nevertheless billed Medicare and Medicaid for the binders and feeding tubes and for the daily rate of the patients that covered those items and services Riverview also made MDS submissions to the Government elevating the RUG of those patients that needed feeding tubes.

66.     These additional examples of Riverview's practice of altering records to cover up fraud and substandard care amount to further violations of the False Claims Act.

**D.     Retaliation**

67.     Relator Cecile Portilla worked for Riverview from June 2011 through March 2, 2012.

68.     Riverview terminated her on March 2, 2012, one day after the New Jersey Department of Health's inspection of Riverview.  The inspection was triggered by Relator's complaint and letter to the Department of Health outlining the violations described above.

69.     At the time of her termination, Relator was serving as a supervisory nurse at Riverview.

70.     Defendants intentionally retaliated against Relator by discharging her because she had raised serious violations of law by Defendants, because she had reported some of these violations to the Department of Health and to other Government agencies, and because Defendants feared that she would become a whistleblower in an action filed against them.

71.     During her tenure at Riverview, Relator complained to Riverview's Director of Nursing and to its Assistant Director of Nursing about the lack of bed alarms.  She also directed her nursing staff not to sign verifications of the presence and functionality of bed alarm, when bed alarms were not present, tested, and functional.  Riverview's management directed Cecile Portilla not to write up her staff nurses for violations of that direction for fear that nurses would retaliate by not coming to work.

72.     Relator alerted Riverview's Director of Nursing and Assistant Director of Nursing to the lack of supervision of residents, the lack of adequate nursing, inadequate care to patients/residents, including failing to maintain their bed alarms and feeding tube binders,

inadequate and improper maintenance of facilities, including the lack of security and faulty locks, lack of alarms for wandering residents, and falsifying records and reporting. She also notified the New Jersey Department of Health of Riverview's bad acts.

73. Defendants retaliated against Relator on March 2, 2012, by terminating her because she had raised serious violations of law by Defendants, because she had reported some of these violations to the New Jersey Department of Health, and because Defendants feared that she would become a whistleblower in an action filed against them.

74. On Friday, March 16, 2012, Relator returned to Riverview with a police escort to retrieve her portable locker that she had purchased to hold her personal belongings while at work. She arrived with a police escort since she was told that she was barred from the building.

75. Upon her arrival, Relator noted that her portable locker was missing and that her locked desk drawer was broken open. When she asked for an explanation, the evening-shift supervisor advised her to return on Monday to meet with the Administrator regarding her property.

76. On Monday, March 19, 2012, Relator returned to Riverview without any police escort. Upon arrival, she discovered her locker and observed that it had been broken open and all of its contents removed. In addition, she discovered that her desk, which she had locked, was broken open and that its contents, including her personal items, were missing. Her missing personal items include a calculator, an electronic blood pressure machine, a pulse oximeter, a stethoscope, a digital thermometer, perfume, makeup, a diary, and a watch.

77. Within her locked desk drawer, Relator had copies of the letters that she had written to Riverview's Director of Nursing on her personal stationery.

78.     When Relator asked Riverview's Administrator for her personal property, he told to get off his property and threatened to call the police.

79.     Riverview's Administrator also told Relator that he had seen the letter that she had written to the Department of Health complaining of Riverview's wrongdoing.  The Administrator then told Relator, "you should never have written that letter to the State."

80.     As a result of Defendants' acts, Relator has suffered economic damages, including but not limited to the loss of her job, the monies she has expended since her discharge in pursuing new employment, and lost wages, as well as damages resulting from personal hardship, including but not limited to emotional distress.

## SUMMARY AND CONCLUSION

81.     Defendants have demonstrated their knowing and willful scheme to seek reimbursement for items and services either not provided at all, or for otherwise worthless, harmful, inadequate, and/or unnecessary services, and to evade the requirements of the NHRA, New Jersey DOH regulations, and other applicable rules and laws.  Consequently, Defendants received payments from Medicare, Medicaid, and other federal healthcare programs that they were not entitled to in violation of the False Claims Act and the New Jersey False Claims Act.

## FIRST CLAIM

### Violations of the False Claims Act
### (31 U.S.C. § 3729 (a)(1)(A))
### Presenting False Claims for Payment

82.     Relator incorporates by reference the above paragraphs as if fully set forth herein.

83.     The United States seeks relief against Defendants under Section 3729(a)(1)(A) of the False Claims Act.  31 U.S.C. § 3729(a)(1) (A).

84.     As set forth above, Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval in connection with the submission of their requests for reimbursement under Medicaid and Medicare.

85.     Medicare and Medicaid paid Defendants because of Defendants' fraudulent conduct.

86.     By reason of Defendants' false claims, the United States has been damaged in a substantial amount to be determined at trial.

## SECOND CLAIM

**Violations of the False Claims Act**
**(31 U.S.C. § 3729 (a)(1)(B))**
**Use of False Statements**

87.     Relator incorporates by reference the above paragraphs as if fully set forth herein.

88.     The United States seeks relief against Defendants under Section § 3729 (a)(1)(B) of the False Claims Act.  31 U.S.C. § 3729 (a)(1)(B).

89.     As set forth above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false and fraudulent claims, in connection with the submission of their requests for reimbursement under Medicaid and Medicare.

90.     The United States paid such false or fraudulent claims because of Defendants' acts and conduct.

91.     By reason of Defendants' false claims, the United States has been damaged in a substantial amount to be determined at trial.

## THIRD CLAIM

### Violations of the False Claims Act
### (31 U.S.C. § 3729 (a)(1)(G))
### Use of False Statements

92.     Relator incorporates by reference the above paragraphs as if fully set forth herein.

93.     The United States seeks relief against Defendants under Section § 3729(a)(1)(G) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

94.     Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government in connection with the submission of their requests for reimbursement under the Medicaid and Medicare Programs.

95.     Defendants failed to pay or transmit money due to the United States because of Defendants' acts and conduct.

96.     By reason of Defendants' use of false statements, the United States has been damaged in a substantial amount to be determined at trial.

## FOURTH CLAIM

### Violations of the New Jersey False Claims Act
### (*N.J.S.A.* § 2A:32C-3a)
### Presenting False Claims For Payment

97.     Relator incorporates by reference the above paragraphs as if fully set forth herein.

98.     The State of New Jersey seeks relief against Defendants under the New Jersey False Claims Act, *N.J.S.A.* § 2A:32C-3a.

21

99.     As set forth above, Defendants, knowingly or acting with deliberate ignorance or with reckless disregard for the truth, presented, or caused to be presented, to an officer, employee, or agent of the State of New Jersey, false and fraudulent claims for payment or approval in connection with the submission of Defendants' requests for reimbursement under Medicaid.

100.     The State of New Jersey paid Defendants under Medicare and Medicaid because of Defendants' fraudulent conduct.

101.     By reason of Defendants' conduct, the State of New Jersey has been damaged in a substantial amount to be determined at trial.

**Violations of the New Jersey False Claims Act**
**(*N.J.S.A.* § 2A:32C-3b)**
**Use of False Statements**

102.     Relator incorporates by reference the above paragraphs as if fully set forth herein.

103.     The State of New Jersey seeks relief against Defendants under the New Jersey False Claims Act, *N.J.S.A.* § 2A:32C-3b.

104.     As set forth above, Defendant, knowingly or acting in deliberate ignorance or in reckless disregard for the truth, made, used, or caused to be made and used, false records and statements, in order to get false or fraudulent claims paid or approved by the State of New Jersey in connection with the submission of Defendants' requests for reimbursement under Medicaid.

105.     The State of New Jersey paid Defendants under Medicaid because of Defendants' fraudulent conduct.

106.    By reason of Defendants' conduct, the State of New Jersey has been damaged in a substantial amount to be determined at trial.

## FIFTH CLAIM

### Violations of the New Jersey False Claims Act
### (*N.J.S.A.* § 2A:32C-3g)
### Use of False Statements

107.    Relator incorporates by reference the above paragraphs as if fully set forth herein.

108.    The State of New Jersey seeks relief against Defendant under the New Jersey False Claims Act, *N.J.S.A.* § 2A:32C-3g.

109.    As set forth above, Defendants knowingly or acting in deliberate ignorance or in reckless disregard for the truth, made, used, and caused to be made and used, false records and statements, in order to conceal, avoid, or decrease the obligation to pay or transmit money or property to the State of New Jersey in connection with the submission of Defendants' requests for reimbursement under Medicaid.

110.    Defendants failed to pay or transmit money due to the State of New Jersey because of Defendants' acts and conduct.

111.    By reason of Defendants' acts and conduct, the State of New Jersey has been damaged in a substantial amount to be determined at trial.

## SEVENTH CLAIM

### Violations of the Federal False Claims Act
### (31 U.S.C. § 3730 (h))
### Retaliation

112.    Relator incorporates by reference the paragraphs above as if fully set forth herein.

113.    Defendants violated Section § 3730(h) of the False Claims Act, 31 U.S.C.
§ 3730(h).

114.    Defendants have intentionally retaliated against Relator by discharging her
and withholding her pay.

115.    Such conduct by Defendants was due to Relator's actions taken in
furtherance of this action, and Defendants had actual and constructive knowledge of such
actions.

116.    Such conduct by Defendants has damaged Relator in a substantial amount,
including but not limited to personal hardship and economic loss, in an amount to be determined
at trial.

### EIGHTH CLAIM

### Violations of the New Jersey False Claims Act
### (*N.J.S.A.* § 2A:32C-10)
### Retaliation

117.    Relator incorporates by reference the paragraphs above as if fully set forth
herein.

118.    Defendants violated the New Jersey False Claims Act, *N.J. S.A.* § 2A:32C-
10.

119.    Defendants have intentionally retaliated against Relator by terminating
her, and taking steps to prevent her from securing other employment.

120.    Such conduct by Defendants was due to Relator's actions taken in
furtherance of this action, and Defendants had actual and constructive knowledge of such
actions.

121.    Such conduct by Defendants has damaged Relator in a substantial amount, including but not limited to personal hardship and economic loss, in an amount to be determined at trial.

WHEREFORE, plaintiffs the United States and New Jersey *ex rel.* Cecile Portilla requests that judgment be entered in their favor and against Defendants as follows:

(a)    On the First, Second, and Third Claims for Relief (Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1) (A), (B) and (G), for treble the United States' damages, in an amount to be determined at trial, and an $11,000 penalty for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant; and

(b)    On the Fourth, Fifth, and Sixth Claims for relief (Violations of the New Jersey False Claims Act, *N.J.S.A.* § 2A:32C-3, for treble the State of New Jersey's damages, in an amount to be determined at trial, plus a $11,000 penalty for each false claim; and

(c)    On the First through Eighth Claims for Relief, an award of costs and attorney's fees pursuant to 31 U.S.C. § 3730(d) and *N.J.S.A.* § 2A:32C; and

(d)    Awarding Relator her relator's share pursuant to 31 U.S.C. § 3730(d) (1) or (2) and *N.J.S.A.* §2A:32C; and

(e)    On the Seventh and Eighth Claims for relief (Retaliation) two times the amount of back pay, interest on the back pay, compensation for special damages sustained, and punitive damages; and

(f)    Awarding such further relief as is proper.

**JURY TRIAL IS DEMANDED**

Dated:   Chatham, New Jersey
         April 10, 2013

                                        LAW OFFICE OF JACK KINT


                                        s/ Jack M. Kint, Jr.
                                        Jack M. Kint, Jr.
                                        187 Southern Boulevard
                                        Chatham, New Jersey 07928
                                        Telephone: (973) 457-5456
                                        Facsimile: (888) 848-0764
                                        jmk@kintlaw.com


                                        of Counsel:

                                        SADOWSKI FISCHER PLLC
                                        Robert W. Sadowski
                                        Raphael Katz
                                        39 Broadway, Suite 1540
                                        New York, New York 10006
                                        Telephone: (212) 913-9678
                                        Facsimile: (646) 502-5357
                                        rsadowski@sflawgroup.com
                                        rkatz@sflawgroup.com


                                        ATTORNEYS FOR
                                        RELATOR CECILE PORTILLA