NOT FOR PUBLICATION

**United States District Court
for the District Of New Jersey**

UNITED STATES OF AMERICA ex rel.
CECILE PORTILLA and THE STATE OF NEW
JERSEY ex rel. CECILE PORTILLA,

                Plaintiffs,

    v.

RIVERVIEW POST ACUTE CARE CENTER,
GREAT FALLS OPERATIONS LLC AND
OMNI ASSET MANAGEMENT LLC,

              Defendants.

Civil No.: 12-1842 (KSH)

**<u>OPINION</u>**

<u>**Katharine S. Hayden, U.S.D.J.**</u>

      Medicare is "a federally subsidized health insurance program for the elderly and certain disabled persons"; Medicaid is "a cooperative federal-state public assistance program pursuant to which the federal government makes matching funds available to pay for certain medical services furnished to needy individuals." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 298–99 (3d Cir. 2011). In recent years, whistleblower suits have been successful in recovering considerable funds for federal and state programs where violations of health-care programs are uncovered. And under the federal and New Jersey False Claims Acts (FCA, 31 U.S.C. § 3729 *et seq.*, N.J.S.A. § 2A:32C-1 *et seq.*), private citizens who bring these suits may share in a portion of recovered funds.

      Calling herself a "paradigmatic whistleblower," plaintiff-relator Cecile Portilla alleges that the defendants—Riverview Post-Acute Care Center in Paterson, New Jersey, a for-profit

1

nursing home; Great Falls Operations, which allegedly owns Riverview; and Omni Asset

Management, which is owned by an officer of Riverview—failed to provide necessary devices

and services for residents to ensure safety and security, all while billing the government as if

they were being furnished.  Portilla also alleges that the defendants fired her after she objected to

these practices and reported Riverview to the authorities.

Presently before the Court is the defendants' joint Fed. R. Civ. P. 12(b)(6) motion to

dismiss [D.E. 20] for failure to state a claim.  For the following reasons, it will be granted and

the complaint will be dismissed.

## I. Factual Background

The following facts are taken from the amended complaint [D.E. 9] and are accepted as

true for the purposes of resolving this motion to dismiss.

Portilla was employed as a registered nurse and night supervisor by Riverview between

June 2011 and March 2012, a little under a year.  (Am. Compl. ¶ 6.)  During that time, she

allegedly witnessed several incidents that alarmed her and led her to believe that the facility—

along with two related entities, defendants Great Falls and Omni Asset Management—was

bilking the Medicare and Medicaid programs by charging for services and devices that were

either substandard or were not being provided, deficiencies that otherwise implicated the

facility's eligibility to participate in the programs at all.  The complaint seeks damages for

violations beginning in 2002 and continuing through to the present.  (Am. Compl. 1–2.)

### A) Bed Alarms, Abdominal Binders, and Patient Health and Safety

According to Portilla, bed alarms are "devices used by nursing homes and hospitals to

alert the staff when a patient attempts to get out of bed unaided"; when triggered, they "sound[]

loudly to alert staff members."  (Am. Compl. ¶ 42.)  In early January of 2012, a resident who was designated a "fall risk," and who was supposed to be monitored by a bed alarm, tried to reach the restroom, fell, and died hours later.  No bed alarm sounded.  (Am. Compl. ¶ 43.)  Portilla was told by Riverview staff to falsify her report on the incident to indicate that "the bed alarm or chair alarm sounded and upon responding to the alarm the resident was already found on the floor."  Portilla refused to do so.  (Am. Compl. ¶ 44.)

Afterwards, Portilla "evaluated the bed-alarm system on all floors of Riverview," discovering that "of the 28 residents who had orders for bed alarms, only one resident had a functional bed alarm."  Further, she "found alarms that were broken or were missing batteries, connection cords, sensor pads, or other parts."  The "majority of residents who had orders for bed alarms had no alarm devices present."  (Am. Compl. ¶ 45.)  Despite this, the facility's certified nursing assistants were "routinely verifying that at every shift those alarms were present and functional despite the fact that they were not present and were not functional. "  Portilla learned about this after reviewing the Treatment Administration Records and Activities of Daily Living reports "on each floor of Riverview."  (Am. Compl. ¶ 46.)  She "informed Riverview's Director of Nursing and its Assistant Director of Nursing of her findings and requested that bed alarms be purchased and installed."  (Am. Compl. ¶ 47.)

Nonetheless, the following month, a Riverview resident fell from his bed without an alarm sounding.  (Am. Compl. ¶ 48.)  Portilla conducted another survey of the alarms, and learned that "[o]f the 26 bed alarms ordered for residents who were at risk for falls, only one alarm was functional."  As before, records for each shift indicated the alarms were functional.  (Am. Compl. ¶ 49; *see also* Am. Compl. ¶ 50 (listing the rooms with broken or missing alarms).)

This time, Portilla complained to the New Jersey Department of Health and Senior Services, both via the internet and in writing.  (Am. Compl. ¶¶ 51–52.)

In early March, a confused resident of the facility escaped and was missing for hours. The resident had been prescribed a "Wanderguard™" alarm, which is supposed to sound when the wearer approaches an exit.  During the incident, it either did not sound or staff "failed to notice that the resident was missing."  According to Portilla, Riverview is located in a "high-crime area" and there is no security guard on duty after 4:00A.M.  (Am. Compl. ¶¶ 53–54.)

Portilla also claims that abdominal binders, which hold in place feeding tubes prescribed to certain residents and must be changed frequently, were missing from certain residents, but were nevertheless being billed to Medicare and Medicaid.  She alleges she brought this to management's attention.  (Am. Compl. ¶¶ 63, 65.)  Portilla further pleads a "pattern" of Riverview residents suffering from dehydration (referring to "at least three" incidents of hospitalization), which she attributes to overworked nurses who failed to regularly provide water to residents.  (Am. Compl. ¶ 64.)

B) <u>The Communications Books</u>

Communications books are maintained by Riverview's nursing supervisors.  (Am. Compl. ¶ 57.)  "Each supervisor made entries in the [books] regarding events or concerns that arose during his or her shift and then passed it to the next shift."  (Am. Compl. ¶ 59.)  After the incidents described above, Portilla told her staff "not to sign for bed or chair alarms that were not installed and functional."  However, numerous staff members disobeyed her instructions, forcing Portilla to write them up.  Management eventually instructed her to stop disciplining staff members for these violations "for fear that staff might retaliate by not showing up for work."

(Am. Compl. ¶ 61.)  In late February, she realized that communications books covering her period of employment, including the stage where she was registering her concerns, were missing. (Am. Compl. ¶ 62.)

### C) Firing

Triggered by Portilla's complaints, the Department of Health inspected Riverview in early March of 2012.[1]  She was fired one day later.  (Am. Compl. ¶ 68.)  When she came back with a police escort to retrieve her property from the facility in mid-March, Portilla discovered that her personal effects (some of which were contained in a locked drawer) were missing. These items included the "the letters that she had written to Riverview's Director of Nursing on her personal stationery."  Portilla was allegedly told by Riverview's Administrator that she should "never have written that letter to the State."  (Am. Compl. ¶¶ 74–79.)

### D) The Alleged Violations

The gravamen of this suit is that the defendants "received payments from Medicare, Medicaid, and other federal healthcare programs that they were not entitled to in violation of the [Federal] [FCA] and the New Jersey [FCA]."  (Am. Compl. ¶ 81.)  The Centers for Medicare and Medicaid Services ("CMS") is the government body that administers Medicare and that "makes payments to medical providers, such as nursing homes, for inpatient and outpatient services after the services are rendered."  (Am. Compl. ¶¶ 9–10.)  Medicare funds are reimbursed generally under a Prospective Payment System (PPS) model; other services are reimbursed under a fee schedule for certain services and equipment.  (Am. Compl. ¶ 11.)

---

[1] Elsewhere, Portilla says that the inspection "confirmed the violations that [she] had reported." (Opp'n Br. 3.)

Portilla contends that a skilled nursing facility (SNF, *see* 42 U.S.C. § 1395i-3) like Riverview is "is paid a daily rate for [Medicare] Part A services for each resident, determined by that resident's care and resource needs, which is categorized into a payment grouping known as a Resource Utilization Group," or RUG.  (Am. Compl. ¶ 12.)  RUG determinations are calculated through the use of an assessment tool called a "Minimum Data Set" (MDS), which "is conducted at multiple times during a resident's stay."  (Am. Compl. ¶ 12.)  Thus, a "resident's daily rate depends on a provider's answers to the questions on the MDS," because "[i]n order to be reimbursed by Medicare and Medicare, a provider must submit a MDS, along with a certification stating that MDS is accurate, and that such accuracy is a condition of payment."  (Am. Compl. ¶ 12.)  Among other prerequisites to payment under Medicare is the submission of an annual report at the end of each fiscal year, which must contain certifications of accuracy.  (Am. Compl. ¶¶ 15, 18–19.)

With regard to Medicaid, which is administered in New Jersey through the state's Department of Health, the amended complaint states that the federal statute "sets forth the minimum requirements for state Medicaid Programs to qualify for federal funding."  (Am. Compl. ¶¶ 26–27.)  Further, the complaint alleges that Riverview's Medicaid submissions and certifications during this period, in which it agreed to "comply with all [Department of Health] and Medicaid regulations," were false.  (Am. Compl. ¶ 31.)

Portilla also refers to the Nursing Home Reform Act (NHRA), which required Riverview "to meet certain Federal and State quality standards in order to qualify to receive Medicare and Medicaid funds."  (Am. Compl. ¶ 33.)  Under the NHRA, for example, "'skilled nursing facilit[ies] must provide services to attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident,' including but not limited to nursing services,

6

specialized rehabilitative services, pharmaceutical services and dietary services."  (Am. Compl. ¶ 34 (citing 42 U.S.C. § 1396r; 42 C.F.R. § 483.25).)

Portilla accuses the defendants of making various false representations.  For instance, Riverview "ha[d] billed residents and CMS for alarms that it has not purchased and for services that it has not performed"; "[b]y billing Medicare and Medicaid for non-functioning alarms, and by making MDS submissions to the Government representing that the residents' daily rates should be increased to cover their needs, Riverview submitted false claims."  (Am. Compl. ¶ 55.) The defendants' express and/or implicit certification of compliance with regulations was also false.  (Am. Compl. ¶ 56.)  And the retaliation against her, Portilla alleges, was a direct result of her whistleblowing.  (Am. Compl. ¶¶ 79–80.)

Portilla organizes her causes of action into eight counts, sounding under the federal and New Jersey FCA (subsections of 31 U.S.C. §§ 3729(a), 3730 and N.J.S.A. §§ 2A:32C-3a, -10, respectively).  The counts are:

1. A *qui tam* claim on behalf of the United States for violations of 31 U.S.C. § 3729(a)(1)(A), in connection with the defendants' presentation of "false and fraudulent claims for payment or approval in connection with the submission of their requests for reimbursement under Medicaid and Medicare," and the United States' payment thereof (Am. Compl. ¶¶ 82–86);

2. A *qui tam* claim on behalf of the United States for violations of 31 U.S.C. § 3729(a)(1)(B), in connection with the defendants' "knowingly ma[king], us[ing], or caus[ing] to be made or used, false records or statements material to false and fraudulent claims, in connection with the submission of their requests for

reimbursement under Medicaid and Medicare," and the United States' payment thereof (Am. Compl. ¶¶ 87–90);

**3.** A *qui tam* claim on behalf of the United States for violations of 31 U.S.C. § 3729(a)(1)(G), in connection with the defendants' "ma[king], us[ing], or caus[sing] to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly conceal[ing] or knowingly and improperly avoid[ing] or decreas[ing] an obligation to pay or transmit money or property to the Government in connection with the submission of their requests for reimbursement under the Medicaid and Medicare Programs," thus causing the defendants to fail to pay or transmit money due to the United States (Am. Compl. ¶¶ 92–96);

**4.** A *qui tam* claim on behalf of New Jersey, pursuant to N.J.S.A. § 2A:32C-3a, for substantially the same conduct (pertaining to Medicaid only) alleged in count 1 (Am. Compl. ¶¶ 97–101);

**5.** A *qui tam* claim on behalf of New Jersey, pursuant to N.J.S.A. § 2A:32C-3b, for substantially the same conduct (pertaining to Medicaid only) alleged in count 2 (Am. Compl. ¶¶ 102–06)[2];

**6.** A *qui tam* claim on behalf of New Jersey, pursuant to N.J.S.A. § 2A:32C-3g, for substantially the same conduct (pertaining to Medicaid only) alleged in count 3 (Am. Compl. ¶¶ 107–11);

---

[2] This count is not separately numbered.  Since the amended complaint otherwise skips count 6 entirely, the Court will assume that this was intended to be numbered as count 5, and will adjust the sequence accordingly.

**7.** A federal FCA retaliation claim, pursuant to 31 U.S.C. § 3730(h), alleging that the defendants retaliated against her by firing her and withholding her pay for steps "taken in furtherance of this action" (Am. Compl. ¶ 112–16); and

**8.** A New Jersey FCA retaliation claim, pursuant to N.J.S.A. § 2A:32C-10, for substantially the same conduct ("terminating [Portilla], and taking steps to prevent her from securing other employment") alleged in count 7 (Am. Compl. ¶ 117–21).

Portilla demanded treble damages in connection with the *qui tam* FCA claims; costs and fees; her *qui tam* share pursuant to 31 U.S.C. § 3730(d) and N.J.S.A. § 2A:32C; and (with regard to the retaliation claims) back pay, damages, and interest.  (Am. Compl. 25.)

## II. Procedural History

As discussed further below, "[t]he FCA allows a private citizen, called a relator, to bring an action in the name of the United States, and the government may intervene if it so chooses. . . .  The FCA permits the relator to bring the action in the absence of the government's intervention."  *United States ex rel. Quinn v. Omnicare Inc.*, 382 F.3d 432, 436 n.7 (3d Cir. 2004).  The relator may collect a portion of moneys recovered.  *United States ex rel. Paranich v. Sorgnard*, 396 F.3d 326, 332 (3d Cir. 2005).

Proceeding initially as Jane Doe, Portilla filed her federal complaint under seal in March 2012.  [D.E. 1.]  The United States declined to intervene under the federal FCA, 31 U.S.C. § 3730(b)(4)(B), by notice filed December 7, 2012.  [D.E. 7.]  The amended complaint was filed in April 2013.

### III. Jurisdiction and Basic Legal Framework

A) <u>Jurisdiction</u>

This Court has federal-question jurisdiction over the federal FCA claims under 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a).  Supplemental jurisdiction extends to the New Jersey FCA claims under 28 U.S.C. § 1367.  *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011).

B) <u>Standard for Motions to Dismiss</u>

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and a motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6) "tests the sufficiency of the allegations contained in the complaint." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  In resolving the motion, all well-pleaded allegations in the complaint must be accepted as true, and all reasonable inferences arising from those facts pleaded must be drawn favor of the non-movant.  *Birdman v. Office of the Governor*, 677 F.3d 167, 171 (3d Cir. 2012).  Under the now well-established *Twombly*/*Iqbal*[3] standard, legal conclusions must be discarded, as must "unadorned, the-defendant-unlawfully-harmed-me" accusations; what remains must be sufficient to show "a plausible claim for relief."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009) (citations and internal quotation marks omitted).  "This plausibility determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679).

---

[3] *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

Most claims brought under the FCA allege fraud, and therefore must be "pleaded with particularity in accordance with Fed. R. Civ. P. 9(b)." *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242 n.9 (3d Cir. 2004). Rule 9(b) says, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). A plaintiff must therefore "plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Lum v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir. 2004) (internal quotation marks & citations omitted). FCA claims pleaded under Fed. R. Civ. P. 9(b) must *also* satisfy the *Twombly*/*Iqbal* "plausibility" requirement of Fed. R. Civ. P. 8(a). *See Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047, 1055 & n.5 (9th Cir. 2011) (collecting cases); *see also Blenheim Group, LLC v. JT USA, LLC*, No. 10-5986, 2011 WL 3203309, at *1 (D.N.J. July 26, 2011) (Simandle, J.).

(The parties dispute the precise application of the 9(b) standard. The viability of Portilla's claims under Fed. R. Civ. P. 9(b) is discussed further in section IV, *infra*.)

Departing from the general rule that FCA claims must meet the more-exacting standard of Fed. R. Civ. P. 9(b), personal claims of FCA retaliation pursuant to 31 U.S.C. § 3730(h) fall under the more-relaxed Fed. R. Civ. P. 8(a) notice-pleading requirement. *See, e.g.*, *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1103 (9th Cir. 2008); *see also Hoyte v. Am. Nat'l Red Cross*, 439 F. Supp. 2d 38, 40–41 (D.D.C. 2006) (distinguishing between *qui tam* "relator" and retaliation "plaintiff"), *aff'd*, 518 F.3d 61, 64 (D.C. Cir. 2008). Although the Third Circuit does not appear to have so held, "[a]ll [other] federal circuit courts of appeal that have faced this issue have reached the conclusion that 31 U.S.C. § 3730(h) claims need only 'meet the Rule 8(a) . . .

11

standard.'" *Thomas v. ITT Educ. Servs., Inc.*, No. 11-544, 2011 WL 3490081, at *3 (E.D. La. Aug. 10, 2011) (quoting *Mendiondo* and collecting cases).

Because a Fed. R. Civ. P. 12(b)(6) motion tests the sufficiency of the complaint, the complaint itself is the primary focus. Accordingly, documents outside of the complaint are generally excluded from consideration, with the exception of "exhibits attached to the complaint, matters of public record, [and] undisputedly authentic documents if the complainant's claims are based upon these documents." *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013) (citation omitted).

### C) False Claims Act – The Statute, *Qui Tam,* and Elements

The FCA was enacted during the Civil War, and was aimed originally "at stopping the massive frauds perpetrated by contractors supplying goods and services for the war effort." *United States v. Hibbs*, 568 F.2d 347, 350 (3d Cir. 1977). It "provides penalties for persons who knowingly submit fraudulent claims to the Government." *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1152 (3d Cir. 1991).

Civil actions can be brought by the government itself or, as is the case here, by private plaintiffs acting in a *qui tam* capacity. *Id.* "The term '*qui tam*' is an abbreviation of the phrase '*qui tam pro domino rege quam pro se ipso in hac parte sequitur*,' which means 'who pursues this action on our Lord the King's behalf as well as his own.'" *United States ex rel. Zizic v. Q2Administrators, LLC*, 728 F.3d 228, 231 n.1 (3d Cir. 2013) (quoting *United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 509 n.1 (3d Cir. 2007)). The government may intervene in a suit brought by a plaintiff, but even if it chooses not to do so, the private plaintiff may continue with her action. *Prudential Ins. Co.*, 944 F.2d at 1152.

Portilla invokes four separate subsections of the federal FCA.  Three of the four are subsections of 31 U.S.C. § 3729, "False Claims": subsections (a)(1)(A), (a)(1)(B), and (a)(1)(G). The relevant portion of the statute reads:

> (a) Liability for Certain Acts.—
>
>> (1) In general.— Subject to paragraph (2), any person who—
>>
>>> **(A)** knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>>>
>>> **(B)** knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . . [or]
>>>
>>> **(G)** knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,
>>
>> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000. . .  plus 3 times the amount of damages which the Government sustains because of the act of that person.

"Knowingly" and "knowing" are further defined as:

>> **(A)** mean[ing] that a person, with respect to information—
>>
>>> (i) has actual knowledge of the information;
>>>
>>> (ii) acts in deliberate ignorance of the truth or falsity of the information; or
>>>
>>> (iii) acts in reckless disregard of the truth or falsity of the information; and
>>
>> **(B)** require no proof of specific intent to defraud;

31 U.S.C. § 3729(b)(1).  "Claim" is defined as:

> **(A)** mean[ing] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—
>
>> (i) is presented to an officer, employee, or agent of the United States; or
>> (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—
>>
>>> (I) provides or has provided any portion of the money or property requested or demanded; or
>>> (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and
>
> **(B)** does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property.

31 U.S.C. § 3729(b)(2).  Relevant to violations of § 3729(a)(1)(G), "obligation" is defined as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  31 U.S.C. § 3729(b)(3).  Lastly, "material" is defined to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

The statutory language above is the partial product of the Fraud Enforcement and Recovery Act of 2009, "which amended the FCA and re-designated 31 U.S.C. § 3729(a)(1) as 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(2) as 31 U.S.C. § 3729(a)(1)(B)."  *Wilkins*, 659

F.3d at 303.  The new § 3729(a)(1)(A) is, for present purposes, mostly identical to the old § 3729(a)(1), whereas § 3729(a)(1)(B) differs from old § 3729(a)(2) by its inclusion of an explicit materiality requirement and its exclusion of language that had previously been construed to create a targeted-intent requirement.  *See id.* at 303–04 & n.12 (discussing *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662 (2008)).  Section 3729(a)(1)(G), meanwhile, is adapted from old § 3729(a)(7).  *See United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 855 n.\* (7th Cir. 2009); *see also United States ex rel. Drake v. NSI, Inc.*, 736 F. Supp. 2d 489, 496 (D. Conn. 2010) (suggesting that the 2009 statutory revisions did not alter "the substantive elements of [the] claim").  Because Portilla's primary narrative concerns post-2009 conduct, the revised statutory provisions apply; however, pre-2009 cases generally remain good law.

Establishing a prima facie claim under § 3729(a)(1)(A) requires showing that "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent."  *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242 (3d Cir. 2004).  The falsity or fraud under § 3729(a)(1)(A) must be material; that is, it must have the potential to affect the payment decision-making process.  *See, e.g.*, *United States ex rel. Williams v. Renal Care Group, Inc.*, 696 F.3d 518, 528 (6th Cir. 2012); *Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1047 (9th Cir. 2012); *United States ex rel. Hutchins v. Wilentz*, 253 F.3d 176, 184 (3d Cir. 2001) ("[T]he submission of false claims to the United States government for approval which do not or would not cause financial loss to the government are not within the purview of the False Claims Act.").

15

The elements of a § 3729(a)(1)(B) claim are that 1) the defendant made, or caused someone else to make, a false or fraudulent record or statement; 2) the defendant knew the statement to be false or fraudulent; and 3) the statement was material to a claim. *United States ex rel. Pervez v. Beth Isr. Med. Ctr.*, 736 F. Supp. 2d 804, 811 (S.D.N.Y. 2010); *see also United States ex rel. Tahlor v. AHS Hosp. Corp.*, No. 2:08–cv–02042, 2013 WL 5913627, at *12 (D.N.J. Oct. 31, 2013) (Martini, J.) (reciting similar elements under predecessor statute); 2 John T. Boese, *Civil False Claims and* Qui Tam *Actions* § 2.01[d], at 2-35 (4th ed. 2011) (listing elements).

Section 3729(a)(1)(G) is sometimes known as the "reverse false claims" provision because it requires a plaintiff to show that "the defendant made or used (or caused someone else to make or use) a false record in order to avoid or decrease an obligation to the federal government." *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242 (3d Cir. 2004). The fraud or falsity is in service of avoiding a flow of funds *to* the government, rather than from. "To make a prima facie case of liability under § 3729(a)(7), the plaintiff must prove that the defendant did not pay back to the government money or property that it was obligated to return." *United States ex rel. Quinn v. Omnicare Inc.*, 382 F.3d 432, 444 (3d Cir. 2004).

Finally, Portilla raises a retaliation claim under § 3730(h). This provision protects an employee who is "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of [an FCA action] or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1). As the Third Circuit has explained:

16

> In order to establish a claim under § 3730(h), [a plaintiff] must show (1) he
> engaged in protected conduct, (i.e., acts done in furtherance of an action under
> § 3730) and (2) that he was discriminated against because of his protected
> conduct. . . . For a plaintiff to demonstrate that he was discriminated against
> "because of" conduct in furtherance of a [FCA] suit, a plaintiff must show that (1)
> his employer had knowledge he was engaged in "protected conduct"; and (2) that
> his employer's retaliation was motivated, at least in part, by the employee's
> engaging in "protected conduct."

*United States ex rel. Hefner v. Hackensack Univ. Med. Ctr.*, 495 F.3d 103, 110–11 (3d Cir. 2007)

(citations and some internal quotation marks omitted).

The New Jersey FCA, which was enacted in 2008, closely resembles the pre-2009

version of the federal FCA. *Compare, e.g.*, N.J.S.A. § 2A:32C-3(a), *with* 31 U.S.C. § 3729(a)(1)

(2008). Thus, it reasonably follows that successfully pleading under one should satisfy pleading

under the other, and the parties raise no arguments specific to the state statutes.

In evaluating FCA claims, a court may not conflate allegations of underlying misconduct

with improprieties in claims submitted to the government. This is because "the statute attaches

liability, not to the underlying fraudulent activity or to the government's wrongful payment, but

to the 'claim for payment.'" *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995); *see also*

*Wilentz*, 253 F.3d at 183 (citing *Rivera* with approval).

## IV. Discussion

### A) The Scope of the Claims

As expansive laws covering an array of services, coordinated by and through a number of

entities at both the state and federal levels, Medicare and Medicaid contain many moving parts:

scattered statutes, regulations (both state and federal), forms, and procedures. The defendants

argue that the deficiencies observed by Portilla, even if true, were irrelevant to Riverview's

payment status; as an SNF, Riverview was compensated on a *per diem* basis that would not have been changed by missing bed alarms or abdominal binders.  Since those individual items were not reported on submitted forms, a false representation related to the items would not have affected the government's decision to pay.

Moreover, the defendants characterize the certifications referred to by Portilla as conditions of *continuing participation* in Medicare and Medicaid, and not conditions of *payment*, because "to plead a claim upon which relief could be granted under a false certification theory . . ., a plaintiff must show that compliance with the regulation which the defendant allegedly violated was a condition of payment from the Government."  *Wilkins*, 659 F.3d at 309. And when a complaint alleges violation of rules that are merely conditions of participation and not conditions of payment, an FCA claim generally cannot be sustained.  *See id.* at 311 ("[I]nasmuch as compliance with the Medicare marketing regulations is not a condition for Government payment under the federal health insurance programs, the District Court properly dismissed appellants' FCA claims based on appellees' violations of those regulations for failure to state a claim upon which relief could be granted.").

The defendants also raise arguments pertaining to the pleading standard, the FCA statute of limitations, and the adequacy of the claims lodged against Omni and Great Falls.  For example, they point out that the six-year non-intervention FCA limitations period would appear to bar Portilla's allegations based on incidents predating March 26, 2006 (*see* Defs.' Moving Br. 23–24).

B) Portilla's 2011–2012 Claims

### 1) Fed. R. Civ. P. 9(b) and Pleading Specific False Claims

The defendants argue that because the amended complaint nowhere points to an actual false claim defendants submitted to the government, the complaint does meet the requirements of Fed. R. Civ. P. 9(b).  (*See, e.g.*, Defs.' Moving Br. 18–21.)

Portilla has not identified any specific submissions that she characterizes as false submissions.  She maintains that to do so is not necessary, and that the out-of-Circuit cases upon which the defendants rely apply a "more stringent" Fed. R. Civ. P. 9(b) standard that has been "flatly rejected by the Third Circuit" (Opp'n Br. 4).  As such, her position is that she has satisfied this Circuit's Fed. R. Civ. P. 9(b) requirements by providing sufficient detail to put the defendants on notice of the locus of the alleged fraud, or what she describes in the opposition brief as "an insider account of Defendants' fraud."  (Opp'n Br. 14–15.)

In their reply brief, the defendants note that, if Portilla were an "insider," that should have helped rather than hindered her ability to plead with specificity.  (*See* Reply Br. 7–8.)  And they deny their cases are out-of-Circuit aberrations: "the Third Circuit and this Court frequently cite to the same Eleventh Circuit authority."  (Reply Br. 8 n.4.)  They correctly point out that while Portilla identifies alleged misconduct taking place at Riverview and writes that Riverview "did submit" certain materials to entities like CMS (*see, e.g.*, Am. Compl. ¶ 24), she nowhere specifies the whens, wheres, and to-whoms of these alleged actionable submissions.  Under the cases defendants rely on, this arguably justifies partial dismissal in and of itself.

The defendants chiefly rely on *United States ex rel. Clausen v. Laboratory Corp. of America*, 290 F.3d 1301 (11th Cir. 2002), in which Clausen had alleged a "multi-faceted,

decade-long campaign to defraud the Government as a result of [the defendant's] testing services." *Id.* at 1303.  The complaint alleged that false claims for payment were submitted "for the services provided on the date of service or within a few days thereafter." *Id.* at 1306.  The Eleventh Circuit deemed this to be insufficient, concluding that an FCA relator cannot "merely [] describe a private scheme in detail but then [] allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *Id.* at 1311.  "[I]f Rule 9(b) is to be adhered to," the court continued, "some indicia of reliability must be given in the complaint to support the allegation of an actual false claim for payment being made to the Government." *Id.* Clausen's complaint failed because, despite describing "alleged schemes by [the defendant] to increase its testing and testing revenues," he nowhere "provide[d] any factual basis for his conclusory statement tacked on to each allegation that bills were submitted to the Government as a result of these schemes." *Id.* at 1312.

The defendants present other cases coming to similar conclusions.  In *United States ex rel. Joshi v. St. Luke's Hospital, Inc.*, 441 F.3d 552 (8th Cir. 2006), the Eighth Circuit held that a relator was required to "provide *some* representative examples of . . . alleged fraudulent conduct" when describing "a systematic practice of . . . submitting and conspiring to submit fraudulent claims over a sixteen-year period." *Id.* at 557.  And in *United States ex rel. Karvelas v. Melrose-Wakefield Hospital*, 360 F.3d 220 (1st Cir. 2004), a district court had analyzed the sixteen "schemes" presented by the relator before dismissing the complaint for failure to provide reference to "actual documentation" of the submitted false claims. *Id.* at 232.  The First Circuit affirmed, because as specific as the pleadings about the underlying schemes might have been, "such pleadings invariably are inadequate unless they are linked to allegations, stated with

particularity, of the actual false claims submitted to the government that constitute the essential element of an FCA qui tam action." *Id.*

Moreover, as the defendants indicate, this Court has relied on *Clausen* on a prior occasion. In *United States ex rel. Piacentile v. Sanofi Synthelabo, Inc.*, No. 05–2927, 2010 WL 5466043 (D.N.J. Dec. 30, 2010), the relator alleged a "three-pronged kickback scheme" by the defendants. *Id.* at *2. This Court concluded that the relator's claims were blocked by the first-to-file bar of 31 U.S.C. § 3730(b)(5) (2008). *Id.* at *4–6. In the alternative, and relying in part upon *Clausen*, the Court determined that the relator's claims did not suffice under Fed. R. Civ. P. 9(b). For example, the complaint said that various drugs "could" be billed by physicians, not that they were; all in all, the relator's conclusory pleadings were not enough. *See id.* at *7–9.

Portilla attempts to distinguish these cases in two ways. First, she argues that subsequent Eleventh Circuit cases stand for the proposition that *Clausen*'s supposed "requirement" is not unyielding, and must be evaluated on a case-by-case basis. In *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350 (11th Cir. 2006), for example, the Eleventh Circuit clarified that it "evaluate[d] whether the allegations of a complaint contain sufficient indicia of reliability to satisfy Rule 9(b) on a case-by-case basis," distinguishing the multi-year conspiracy in *Clausen* from an outcome in a smaller case. *Id.* at 1358–59 (citing, inter alia, *Hill v. Morehouse Med. Assocs.*, No. 02-14429, 2003 WL 22019936 (11th Cir. Aug. 15, 2003)). Portilla's complaint describes a scheme closer to the one in *Atkins*.

Portilla's second point is that the Third Circuit has suggested that pleading actual instances of false submissions is not always required to state an FCA claim. Specifically, in *Wilkins*, the Circuit distinguished a previous case where it had "held that the district court correctly granted the defendant's Federal Rule of Civil Procedure 56(f) motion for summary

judgment based on the plaintiff's failure to identify a single claim for payment to the Government arising from defendant's alleged Medicare fraud." *Wilkins*, 659 F.3d at 308 (citing *United States ex rel. Quinn v. Omnicare Inc.*, 382 F.3d 432, 440 (3d Cir. 2004)). That case, the Circuit said, involved summary judgment; by contrast, the Circuit had "never . . . held that a plaintiff must identify a specific claim for payment *at the pleading stage* of the case to state a claim for relief." *Id.* (emphasis added). However, the Circuit did not explicitly hold that identification of a specific claim at the pleading stage was not required.

In light of the Third Circuit's explanation that "alternative means" can suffice in certain cases—*see, e.g.*, *Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144 (3d Cir. 2004) ("Although Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." (internal quotation marks & citations omitted)); *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984)— detailed descriptions of particular fraudulent submissions cannot be a strict prerequisite under Fed. R. Civ. P. 9(b). Moreover, the Third Circuit has repeatedly emphasized that the purpose of Fed. R. Civ. P. 9(b)'s pleading requirements is to give the defendants adequate notice of the allegations lodged against them. *See, e.g.*, *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 414 n.2 (3d Cir. 2003) ("The purpose of Rule 9(b) is to provide notice, not to test the factual allegations of the claim."); *Bd. of Trs. v. Foodtown, Inc.*, 296 F.3d 164, 172 n.10 (3d Cir. 2002); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997). Additionally, a court in this Circuit has determined that, where a complaint sufficiently alerts a defendant of its wrongdoing, providing a "single claim example" would not put the defendant "in a better position to answer and defend against Relator's claims," especially

22

if "[t]he fraud of the instant claims does not turn on anything unique to an individual claim or anything that would be revealed from an examination of any claim." *United States ex rel. Budike v. PECO Energy*, 897 F. Supp. 2d 300, 320 (E.D. Pa. 2012).  Another court has held that attachment of "some or all of the allegedly fraudulent claims would serve no further purpose consistent with Rule 9(b) because defendants are on notice that the basis of the alleged fraud in each claim is the relationship between defendants, not anything unique to a particular claim, that has caused these claims to be allegedly fraudulent." *United States ex rel. Repko v. Guthrie Clinic, P.C.*, 557 F. Supp. 2d 522, 527 (M.D. Pa. 2008).  And a court in this District has taken *Wilkins* at its word that specifically showing an "actual false claim" is not required at the pleading stage.  *See Foglia v. Renal Ventures Mgmt., LLC* [*Foglia I*], No. 09-1552, 2012 WL 4506014, at *4 (D.N.J. Sept. 26, 2012) (Hillman, J.); *see also Dale v. Abeshaus*, No. 06-CV-04747, 2013 WL 5379384, at *11 n.62 (E.D. Pa. Sept. 26, 2013) (observing the same element of the decision in *Wilkins*).[4]

Based on this authority, the Court concludes that Portilla's failure to allege a specific instance where the defendants submitted a fraudulent claim is not, in itself, fatal to her lawsuit. However, in order to satisfy Fed. R. Civ. P. 9(b), Portilla must still meet the "alternative means" test, because "even under our Court of Appeals's so-called flexible approach to Rule 9(b), a relator must offer particulars to satisfy . . .  the Rule 9(b) pleading standards." *United States ex*

---

[4] Nor does Portilla's "insider" status weigh against this outcome.  The "insiders" in the cases cited by the defendants were an "executive director of Southern California Rehabilitation Services," *Bly-Magee v. California*, 236 F.3d 1014, 1016 (9th Cir. 2001), and a twenty-year supervisory employee, *United States ex rel. Lee v. Smithkline Beecham Clinical Labs.*, 245 F.3d 1048, 1052 (9th Cir. 2001).  While an "insider" in the sense that she had a certain degree of authority, Portilla does not claim supervision over billing decisions.

*rel. Knisely v. Cintas Corp.*, No. 10-1193, 2014 WL 983468, at *7 (E.D. Pa. Mar. 14, 2014) (distinguishing *Wilkins*). The Court finds that she has not satisfied the test.

Although the complaint refers frequently to Riverview's "fraud" and improper billing practices (*see, e.g.*, Am. Compl. ¶¶ 43, 46), Portilla never establishes with precision the basis for asserting that the deficiencies she observes were part of the annual Medicare cost reports submitted by the facility (*see* Am. Compl. ¶ 22). The opinion on remand in *Wilkins* is instructive. Judge Kugler assumed, based on the Third Circuit's opinion, that "Relators met the Rule 9(b) requirement that a defendant's state of mind must be at least generally alleged in the complaint." *United States ex rel. Wilkins v. United Health Grp, Inc.*, No. 08-3425, 2011 WL 6719139, at *2 (D.N.J. Dec. 20, 2011). Despite meeting part of the Fed. R. Civ. P. 9(b) requirement, the relators ultimately did not "inject[] . . . precision or substantiation into th[e] allegation of the Amended Complaint, resting only on the Amended Complaint's assertion that the payment was, indeed, made." *Id.* With regard to an argument pertaining to an allegedly unlawful provider agreement, the relators "failed to point specifically to any instance where the Agreement was actually used—either by 'date, place or time,' or by some other means that would inject precision and substantiation into their allegations"—even though they attached the agreement to their complaint. *Id.* at *3.

In this case, despite setting out the basic framework of Medicare and Medicaid reporting and reimbursement, the complaint's actual allegations of fraud are imprecise. For instance, the complaint provides ample detail about the resident's incident without a bed alarm—dates, times, and locations—but then simply asserts that Riverview "billed Medicaid for an alarm as well as for resident X's daily rate during his stay, despite its failure to provide appropriate services." (Am. Compl. ¶ 43.) Allegations that would help to describe these submissions or billing

24

practices with precision are absent outside of the general overview of the statutory and regulatory framework provided in the amended complaint's opening paragraphs. In short, Portilla fails to "alleg[e] particular details of a scheme *to submit false claims* paired with reliable indicia that lead to a strong inference that claims were actually submitted." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) (emphasis added)

In sum, the Court concludes that the amended complaint fails to meet the heightened pleading requirements of Fed. R. Civ. P. 9(b). Nevertheless, the Court also finds, as discussed below, that the amended complaint separately fails to state FCA claims upon which relief could be granted. *See Knisely*, 2014 WL 983468, at *7 (requiring relator to satisfy "both the elements of an FCA claim and the Rule 9(b) pleading standards").

### 2) Stating a Claim under the FCA

Defendants maintain that Portilla has failed to successfully plead any FCA claims. Specifically, they argue that she has failed to adequately plead either of two falsity theories: 1) factual falsity, in which "unidentified claims submitted to Medicare or Medicaid are factually false because they included itemized costs for bed alarms or abdominal binders"; or 2) "legal falsity," based on the defendants' submission of false certifications of compliance with Medicare or Medicaid rules and regulations. (Defs.' Moving Br. 7.)

As suggested by the above, there are two main categories of false claims under the FCA: factually false claims and legally false claims. Legally false claims are further divided. So a plaintiff or relator may establish liability through :

1) **Factual falsity**, which exists when a "claimant misrepresents what goods or services that it provided to the Government," *Wilkins*, 659 F.3d at 305;

25

2) **Express false certification**, a subset of **legal falsity**, where "an entity is liable under the FCA for falsely certifying that it is in compliance with regulations which are prerequisites to Government payment in connection with the claim for payment of federal funds," *id.*; and

3) **Implied false certification**, a subset of **legal falsity**, "which attaches when a claimant seeks and makes a claim for payment from the Government without disclosing that it violated regulations that affected its eligibility for payment," *id.* at 305–06 (joining the rest of the Circuits in recognizing the implied false certification theory of liability). "[T]he relevant inquiry is whether the defendant's conduct implies compliance with all conditions required for payment and, thus, entitlement to payment." *Foglia I*, 830 F. Supp. 2d at 19.

Portilla suggests that her false-certification theories are secondary to her claims of factual falsity: "Relator does [not] need to depend on a false certification theory because the claims were false on their face." (Opp'n Br. 11.)

a) <u>Factual Falsity</u>

The defendants contend that "claims for skilled nursing services are paid under a PPS that does not provide separate reimbursement for routine costs, such as bed alarms or abdominal binders." Portilla has not "cite[d] to any rule, regulation, or standard that would indicate that the costs of either bed alarms or abdominal binders are separately claimed by Riverview or separately reimbursed by Medicare or Medicaid." (Defs.' Moving Br. 7–8 (citing 42 C.F.R. § 13.335(b)). In the reply brief, defendants further contend that "because neither bed alarms nor

abdominal binders are on a claim form, the claim form cannot, by definition, be factually false."
(Reply Br. 2.)

Portilla argues that although the claim forms may not specify bed alarms and abdominal
binders, the needs of residents who require them are part of the MDS entry process, which in
turn affects individual RUGs, which only then are part of the PPS *per diem* rate. (*See* Opp'n Br.
10; Reply Br. 2–3.) As Portilla notes, the defendants conceded that a RUG classification is
based on "periodic assessments that a[n SNF] must perform on or about the 5th, 14th, 30th, 60th,
and 90th day of the patient's Medicare Part A stay in the facility." (Defs.' Moving Br. 4.)
Similarly, the New Jersey Medicaid program "reimburses [SNFs] on the basis of prospective *per
diem* rates through a system 'based on the average needs of individuals' in the facilities' care."
(Defs.' Moving Br. 5 (quoting N.J.A.C. § 8:85-3.1(a), (f))). Portilla distinguishes the *per diem*
cases cited by the defendants as involving the Diagnosis Related Group (DRG) PPS system used
by hospitals, and not the RUG system used by SNFs and other nursing-home facilities. *See, e.g.*,
*United States ex rel. Stephens v. Tissue Sci. Labs., Inc.*, 664 F. Supp. 2d 1310, 1317–18 (N.D.
Ga. 2009).

Portilla's factual-falsity allegations remain too thin to support a claim for relief under
Fed. R. Civ. P. 9(b). If bed alarms and abdominal binders are not itemized, and if Riverview was
compensated under a *per diem* rate (as is undisputed), the complaint needs to connect
Riverview's requests for reimbursement to the missing items. Portilla tries to do so by
constructing a causal chain: Riverview reports via MDS the needs of its residents, which affects
(at certain intervals) the RUG and, thus, the *per diem* rate. However, Portilla does not
adequately plead that the particular omissions she observed were a necessary prerequisite to a
particular RUG classification. For example, Portilla refers to "conditions that require bed

27

alarms," (Sur-reply 5) but does not connect the entry of data on the MDS to any instance where the defendants furnished that information and affected the RUG.

Portilla relies in part on *United States ex rel. Hunt v. Merck-Medco Managed Care, L.L.C.*, 336 F. Supp. 2d 430 (E.D. Pa. 2004), but that case is distinguishable.  In *Merck*, the government alleged that the defendant had submitted false claims in connection with a program drawing "a fixed annual contribution from the Government."  *Id.* at 442.  The government's complaint had specified the causal chain that affected payment from the program: the defendant presented a claim to Blue Cross, which then billed the United States, but the defendant's applications for reimbursement contained false statements.  *Id.* at 438.  These claims appear to have been at least partly itemized; for example, the defendant "allegedly billed for products that it simply did not provide."  *Id.* at 439.  The court held that even though the "government program . . . involved a fixed annual contribution," the government had successfully pleaded harm, because the government's "statistically weighted average" fixed contribution to the program could have been increased by the defendant's false statements.  *Id.* at 442.  That the increase did not occur immediately was of no moment.  *Id.* at 442–43.  Thus, in *Merck-Medco*, the government had 1) pleaded a pattern of submitting specific false claims to 2) a program to which the government made annual contributions based on statistical averages.  The connection between the false claims and the increase in payouts was adequately alleged.

Here, by contrast, Portilla has not generally pleaded that the specific omissions or oversights she observed were actually submitted directly to the government or its intermediary. Rather, the argument is that 1) Riverview represented certain patient conditions on its MDS entries, but 2) did not provide services commensurate with the level to be expected of those patients.  While there may be differences between the way DRGs and RUGs are calculated,

28

Portilla has not shown, with the specificity required by Fed. R. Civ. P. 9(b) or *Twombly*/*Iqbal*, that statements about bed alarms or abdominal binders were ever made, or that omissions inferentially affected the RUG calculations.

Portilla does allege that the defendants were required to submit annual cost reports pursuant to 42 C.F.R. § 413.20; to the extent that those reports were itemized, they may have included false statements regarding the provision of certain services to residents of the facility. (*See* Am. Compl. ¶ 15.)  She has not pleaded, however, that the inclusion of individual false items in a § 413.20 certification would necessarily affect the *per diem* rate at which the facility was compensated, in light of the alternative calculations that went into determining such a rate. *Cf. United States ex rel. Kennedy v. Aventis Pharm., Inc.*, No. 03 C 2750, 2008 WL 5211021, at *4–5 (N.D. Ill. Dec. 10, 2008) (distinguishing the general existence of false statements from actionable false statements used to influence costs).  Further, Portilla has not shown to the level of precision required by Fed. R. Civ. P. 9(b) that the falsification of the communications books was connected, either directly or indirectly, to any false reporting to the government or its intermediaries.

Accordingly, the Court finds that Portilla has not successfully pleaded a claim of factual falsity.

b) Legal Falsity/False Certification

Portilla alternatively pleads the numerous certifications that a defendant such as Riverview must make to participate in and be paid by the Medicare and Medicaid programs. (*See, e.g.*, Am. Compl. ¶¶ 12–24.)  The defendants argue that because these regulations are

conditions of participation only and not of payment, they cannot be the basis of FCA liability under Third Circuit law.  (*See, e.g.*, Defs.' Moving Br. 8–15.)

In *Wilkins*, the Third Circuit reemphasized that "to plead a claim upon which relief could be granted under a false certification theory, either express or implied, a plaintiff must show that compliance with the regulation which the defendant allegedly violated was a condition of payment from the Government."  *Wilkins*, 659 F.3d at 309.  "'Conditions of participation . . . are enforced through administrative mechanisms, and the ultimate sanction for violation of such conditions is removal from the government program,' while '[c]onditions of payment are those which, if the government knew they were not being followed, might cause it to actually refuse payment.'"  *Id.* (quoting *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1220 (10th Cir. 2008)); *see also Foglia I*, 830 F. Supp. 2d at 19.

Portilla cites numerous regulations Riverview allegedly violated.  It appears, however, that several are prerequisites to participation.  For example, Portilla refers to certifications of compliance with the Nursing Home Reform Act under 42 C.F.R. § 483.25, but internal New Jersey Department of Health and Human Services decisions reveal that noncompliance can result in administrative sanctions.  In *Golden Living Center – Rib Lake v. CMS*, No. CR2698, 2013 WL 2950534 (N.J. Dep't of Health and Human Servs. Jan. 25, 2013), the Department Appeals Board explicitly referred to § 483.25 as involving "program participation requirements."  *Id.* at *1, 4. The Board concluded that the petitioner "violated 42 C.F.R. § 483.25(h)" because there was "a risk for more than minimal harm" to a resident, holding that there was "a basis for the imposition of an *enforcement remedy*."  *Id.* at *25 (emphasis added).  Elsewhere, the Board noted that the statutory and regulatory framework required termination of program eligibility for repeat or longstanding violators.  *See id.* at *2.  Under the definitions set forth in *Wilkins*, because

compliance with § 483.25 is a classic condition of participation and not payment, Portilla cannot state a legal-falsity claim under the FCA by showing that Riverview violated the regulation.

In her opposition brief, Portilla focuses on another particular regulation: N.J.A.C. § 10:49-5.5(a).  She contends that New Jersey "specifically excludes from payment by Medicaid services that are not adequately documented in the health care records and services that are not performed with an acceptable quality of care."  (Opp'n Br. 12.)[5]  But Portilla does not connect these standards under which care must be provided with individualized aspects of payment, especially in light of New Jersey's administrative scheme for resolving disputes arising under its regulations.  *Cf.* 42 C.F.R. § 488.606.

In *Foglia v. Renal Ventures Management, LLC* [*Foglia II*], No. 09-1552, 2012 WL 4506014 (D.N.J. Sept. 26, 2012) (Hillman, J.), *appeal pending*, C.A. No. 12-4050, a relator argued that the defendant "violated the FCA by: . . . falsely certifying that it was in compliance with all State regulations when it had violated certain sections of the New Jersey Administrative Code."  *Id.* at *2.  The defendant responded "that under either an express or implied false certification theory, relator cannot show that defendant violated a regulation which required compliance as a condition of payment from the Government."  *Id.*  Although the primary claim was pleaded with enough specificity to survive a Fed. R. Civ. P. 9(b) challenge, *see id.* at *4, the relator failed to state a claim under the FCA.  Judge Hillman held that the violation of the relevant regulations did not affect Medicare *payment* eligibility, but rather affected conditions of participation only.  *Id.* at *6–7.

---

[5] The brief actually cites to § 10:49-5.**6**, but she appears to have intended to refer to the previous section, which is the one mentioned in her complaint.  (*See* Am. Compl. ¶ 28.)

*Foglia II* is not entirely on point, because it connected the violation of state regulations with Medicare compliance and not Medicaid compliance.  However, it is illuminating to the extent that it provides an example of statutory and regulatory rules of construction under the FCA.  As the Circuit instructed in *Wilkins*, not every violation of a regulation is the basis for a *qui tam* suit.  *Wilkins*, 659 F.3d at 310.  Portilla has not adequately connected noncompliance with these state regulations, and the process of certifying compliance with them, with either Medicare or Medicaid violations as a condition of payment under the *Wilkins* definition. Accordingly, she has not stated a valid claim for relief.

### c) <u>Retaliation</u>

The defendants give two reasons why Portilla's retaliation claim should fail: she was not acting "in furtherance of" an FCA action because the allegations could not "give rise to a viable FCA violation"; and even assuming she was engaged in protected activity, Riverview did not know she was engaging in protected conduct "because she raised nothing more than regulatory concerns."  (Defs.' Moving Br. 27.)  Assuming that Portilla can state a valid FCA retaliation claim under Fed. R. Civ. P. 8(a) without necessarily pleading a satisfactory substantive FCA claim, the issue is whether her conduct was "in furtherance of" an FCA action as defined by § 3730(h).  *See Wilentz*, 253 F.3d at 187–88.

The Court concludes that, under the *Twombly*/*Iqbal* pleading standard, the complaint does not show that Portilla was engaging in conduct sufficient to put Riverview on notice of the "distinct possibility" of FCA litigation.  *Id.* at 188.  Concerned about the allegedly shoddy care at the facility, regulatory violations, and attempts to falsify records to avoid liability, Portilla made

her concerns known and eventually contacted the New Jersey Department of Health. Portilla alleges, for example, that:

- She contacted the Director of Nursing and other Riverview supervisors in order to ensure installation of bed alarms (Am. Compl. ¶ 47);

- She reported the "deficient bed and chair alarms" to the Department of Health (Am. Compl. ¶¶ 51–52); and

- She advised staff to not put falsehoods into the communications books (*see* Am. Compl. ¶ 61))

This, she contends, shows that she was terminated "because she had reported some of these violations to the Department of Health and to other Government agencies, *and because Defendants feared that she would become a whistleblower in an action filed against them*." (Am. Compl. ¶ 70 (emphasis added).) But nowhere does Portilla discuss how the defendants would have been aware that billing practices or Medicare/Medicaid fraud was on Portilla's mind. By contrast, the facts adduced in the complaint lead to the conclusion that Portilla was terminated because of her administrative, regulatory whistleblowing. This is not a FCA retaliation claim.

### d) New Jersey FCA Claims

The parties devote little discussion to the New Jersey FCA claims. However, based on the above analysis, they fail for substantially the same reasons as did the federal FCA claims.[6]

---

[6] Further, the Court notes that the New Jersey FCA became effective on March 13, 2008. Because the statute is "not retroactively applicable to conduct occurring prior to its effective date," *State ex rel. Hayling v. Correctional Medical Services, Inc.*, 422 N.J. Super. 363, 370 (App. Div. 2011), Portilla's state-law FCA claims attaching to pre-March 13, 2008 conduct would have to be dismissed in any event.

33

C) Portilla's Pre-2011 Claims

Although the Court's determination above applies logically to Portilla's pre-2011 claims, the Court will nevertheless address the defendants' arguments pertaining to those separate claims. They argue that, pursuant to the six-year limitations period contained in 31 U.S.C. § 3731(b)(1), Portilla's claims pertaining to incidents before March 26, 2006 must be dismissed.[7] (Defs.' Moving Br. 23–24.) Portilla argues that this defense is premature because "the Government can intervene at any time." (Opp'n Br. 17.)

Presently, there is a circuit split over whether the tolling provision of § 3731(b)(2) applies in the absence of government intervention. *See United States ex rel. Bauchwitz v. Holloman*, 671 F. Supp. 2d 674, 693 (E.D. Pa. 2009) (collecting cases). However, Portilla does not argue that she herself can take advantage of the tolling, nor does she provide any reason to believe that she would be entitled to it. Accordingly, the Court will dismiss claims arising out of conduct from before 2006.

Further, Portilla's complaint contains absolutely no factual allegations about conduct taking place before she joined Riverview. In that respect, it is defective under Fed. R. Civ. P. 8(a) and the *Twombly*/*Iqbal* standard. While such a defect might ordinarily be curable by amendment, based on the prior merits discussion, amendment here would be futile.

---

[7] "[T]he law of this Circuit (the so-called 'Third Circuit Rule') permits a limitations defense to be raised by a motion under Rule 12(b)(6), but only if the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002) (internal quotation marks and citations omitted).

D) <u>Great Falls and Omni</u>

In her complaint, Portilla fails to connect any wrongdoing to Great Falls and Omni; she simply indicates that those two companies may in some way be associated with Riverview. (Am. Compl. ¶ 7.)  She has since submitted materials that would tend to show that the entities are not necessarily separate companies, such as a "Registration of Alternate Name" form.  [D.E. 40.] The Court must confine its scrutiny to her amended complaint, and because that document fails to adduce any relevant facts regarding Great Falls and Omni's involvement in any scheme—nor any reason to disregard corporate forms—the Court will dismiss all claims against Great Falls and Omni.

## IV. Conclusion

For the foregoing reasons, the defendants' motion to dismiss will be granted.  An appropriate order will follow.

March 31, 2014                                    /s/ Katharine S. Hayden
                                                          Katharine S. Hayden, U.S.D.J.